## Wood v. Wood.

### Opinion delivered January 4, 1915.

1. TITLE—RECORD TITLE—PRESUMPTION OF OWNERSHIP—BURDEN OF PROOF. —In an action by appellant against appellee, her husband, for alimony, appellee set up that certain lands, title to which was in appellant belonged one-half to him by reason of his having paid the purchase price of the same. *Held*, the title to the lands in controversy being in appellant, the burden was upon the appellee to prove the allegations of his cross complaint by a preponderance of the testimony, in order to entitle him to the relief sought, of having title to one-half the land vested in him.

2. HUSBAND AND WIFE—TITLE IN WIFE'S NAME—PRESUMPTION—GIFT.— Where title to land is taken in the wife's name, although the husband furnished the money therefor, the presumption is that the husband intended a gift, and the proof to overcome this presumption must be clear and convincing.

3. HUSBAND AND WIFE—WIFE'S DEED TO HUSBAND—EQUITY.—Where a wife conveys her property by deed to her husband, because of the dominating influence of a husband over his wife, the transaction will in equity be scrutinized with care.

4. HUSBAND AND WIFE—GIFT—COERCION—BURDEN OF PROOF.—A conveyance from a wife to her husband will not be defeated when it

clearly appears that the transaction was free from any undue in-
fluence on the husband's part, and when it is clearly shown that
the wife intended to make a gift of the property to her husband,
but the burden is upon the husband to show that the transaction
was fair.

5. DEEDS—GIFT—DELIVERY.—A wife executed and acknowledged a deed
conveying certain lands to her husband, so that he might have the
same in the event of her death. She did not deliver the deed to
him. *Held*, no title ever passed to the husband.

6. DEEDS—GIFT—DELIVERY.—A wife executed and acknowledged a deed
to certain lands deeded to her husband. The notary who took the
acknowledgment handed the deed to the husband. The wife testi-
fied that she never did, nor did she intend to deliver the deed to
her husband, and that she had secured and held possession of the
same. *Held*, the deed was never delivered to the husband, the act
of the notary not constituting a legal delivery.

Appeal from Sevier Chancery Court; *James D.
Shaver*, Chancellor; reversed.

STATEMENT BY THE COURT.

This suit was instituted by the appellant against the
appellee for alimony. She alleged that she was married
to the appellee June 18, 1900, and that they lived to-
gether as husband and wife until December 15, 1912, when
the appellee, without cause, abandoned her, and that he
had failed to support her; that he had considerable money
and property, which she set forth in her complaint.

The appellee answered, admitting the marriage. He
denied that he abandoned appellant without cause; de-
nied that he had failed to support her, and, by way of
cross complaint, alleged that appellant had abandoned
him, "that she was of a jealous and nagging disposition,
such as rendered his life intolerable, and accused him of
trying to poison her, and had unjustly accused him of
adultery; that he had purchased a certain tract of land,
which he described, but on account of being on bad terms
with his neighbors, had the deed made to the appellant;
that before their marriage he had furnished appellant
money to file a donation claim to a certain other tract,
which he described, and that after their marriage appel-
lee, with his own means, had improved the latter tract to
the extent of $500; that the appellant, knowing that these

lands were not her own, and in consideration of the labor and money expended by appellee in improving the same, had executed and delivered to him a deed to an undivided one-half interest therein; that the deed had been lost or mislaid and was never recorded. He prayed for a divorce, and that title be vested in him to one-half of the lands, and other relief.

The appellant testified that she owned 215 acres of land in Little River County, of which she bought fifteen acres outright from the State, and donated 120 acres more, and bought eighty acres from one Ed. Dollarhide. She testified that the defendant did not furnish any of the money with which to purchase this land. Stated that she and her brother borrowed the money with which to buy fifteen acres and to donate 120 acres of the land. The Dollarhide tract of eighty acres was purchased with money which she obtained by selling the interest which she had inherited from the Gillihan estate.

She testified that before her marriage to the appellee, she hired him to improve the land. "He worked for me at $19 per month for ten or twelve months, improving the property. At the same time I hired several other parties, and all were paid out of the timber." Appellant then exhibited in evidence nine receipts signed by the appellee. She explained that she paid the parties, including the appellee, and took receipts from them showing payments for the work done by them during separate months in the years 1898 and 1899. One of the receipts recited that it was for $16, the balance due for two months' work, dated August 29, 1898. The other receipts, eight in number, were for $19 each, for separate months of 1898 and 1899, which are designated. She also exhibited, in this connection, seven receipts signed by one Riddle for work done during the years 1898 and 1899 for $15 each for the separate months designated, and also two receipts from one Seastrunk, and one from James Black, for work done during the year 1900, for the months designated in the receipts. She stated, in this connection: "I paid these men from the sale of timber. I got $603

from the Hempstead County Bank for timber before our marriage. I had a statement thereof in my satchel until yesterday, when I fainted, and it has disappeared." She further testified: "Wood put no improvements on the land before our marriage that he did not receive pay for."

Concerning the making of a deed by her to appellee for a one-half interest in the land, she testified as follows: "I did make a deed to Wood for one-half interest in my land. We were not getting along well together, he was threatening to leave me, that my health was poor; I was not able to work and make my living, and I could not rent the land for enough to keep me up, and I made a deed with the understanding that I was to hold the deed as long as I lived, and in case I should die without leaving him a child to inherit the land, he was to have a half interest in it, and was to live with me and support me as long as I lived. He was not to have the deed until my death. I never delivered the deed to him; afterward he quit me, and I destroyed the deed, and I never intended that Mr. Wood should have any deed or title to this land until my death; that was the understanding."

In this connection, the record shows the following:

Q. After the deed was acknowledged, what did you do with it?

A. I put it in my trunk, locked it up and kept it.

Q. Did he ever receive this deed from you?

A. No, sir; he tried to take it, but I would not let him have it after he deserted me.

Q. How did he try to get it?

A. He tried to file the lock off the trunk.

Q. How did you prevent him?

A. Striking at him with a knife; he slapped my jaws, and I struck at him with a knife.

Q. What did he say he wanted with the deed?

A. He said he did not want the deed, but I knew he did.

Q. Why did you destroy the deed?

A. Because he had not complied with his request. He had left me, and he was not entitled to it.

Q. Did he ever pay you anything to get this deed executed?

A. No, sir; not one cent; it was never the understanding that he was to pay me anything.

Appellant testified that appellee had tried to destroy the receipts and other papers in evidence, but that she had hid them and that appellee did not know until the day she was testifying that he had not succeeded in destroying the papers. She stated, in answer to a question, that she knew the deed had never been delivered to the appellee, because she had never delivered it.

Witness C. W. Wright corroborated the testimony of the appellant as to the purchase of her interest in the Gillihan land, for which he paid $100, and that part of this money was paid on the Dollarhide land. This witness also testified that he bought timber of Mrs. Wood, which amounted to $199.63, and stated that the timber taken from the land would have more than paid for the improvements put on it before he purchased the remaining timber. He further stated that before the parties were married, that the appellee had no property that witness knew of, and that the parties traded with witness.

Appellee testified in his own behalf, in part, as follows: "When we were married, wife had a one-fourth interest in her father's estate and a deed to 15.87 acres I bought in her name in 1897; we were engaged at the time; she urged me to get the land before her brother and Jones got it; I told her if she could borrow the money to file, to go ahead and borrow it and file, and I could pay it back; she borrowed the money of I. B. Wright, and I gave her the money to pay him; in 1903 we sold her inheritance for $100, and I applied $50 of that money on the purchase of the Dollarhide land and gave my note for $75, which I paid myself. It was always understood, if anything came up, we were to divide the land equally; had title to Dollarhide eighty put in her name on account of having had some trouble with my neighbors. I put all improvements that were made on this land. Before we were married, I built a house, cleared six acres, and since then have built a house on the donation and cleared eight or

ten acres and fenced same; in fact, put all improvements there except one shanty and about three acres of deadening; think improvements done by me worth $900; that most rent in any one year received by me is $76. Mrs. Wood did make me a deed to one-half interest in the 215 acres of land. It was always understood between us that I was to have one-half interest in our home. I was to have this one-half interest for doing the work and making the improvements and paying the $75 on Dollarhide tract. The deed was delivered to me in her presence at Wilton; I took it and put it in my trunk which I kept locked; she had a key to it and it stayed there until we moved to Mena, and I neglected to have it recorded. While at Mena, and shortly after she had a spell of sickness there, I looked for the deed, and could not find it, and asked her and she said that she had fixed it so it would never do me any good, that she had burned it up."

Further on he stated: "I did not work for Mrs. Wood for wages; she donated the 120 acres before we married; wife had no money and did not receive $600 in June before our marriage. At the time she made deed to me, I thought it best on account of her being jealous and cranky, and there being an understanding I was to have half thereof; I asked her, saying it was time, so that if anything happened to either one of us, our brothers could not step in and take it away from the other, and she thought it was."

He denied that he had threatened to quit her if she did not make the deed; said he did not ask her for a deed when they had separated before, thinking she would come back. Said a consideration of $5 was named in the deed, and it was paid. He made no promise to live with her at the time, and did not contemplate leaving her. Said Mrs. Wood never employed him and never gave him a cent. Denied that he had tried to destroy any receipts given her by burning them.

Further on, he says: "I insisted on my wife making deed because she would take cranky spells, and I was afraid she would get mad and go sell the place or timber

off of it, as she did once before." Appellee had between $50 and $100 in cash when he married appellant.

After appellant had testified that she had hired appellee to do work for her before they were married and had paid him for the work, exhibiting the receipts already referred to, the appellee then testified in rebuttal as follows: "The receipts from me introduced by Mrs. Wood were given by advice of Mr. Jones, who suggested that we 'frame up' something to show, when we were being prosecuted for living together as man and wife; he drew up a contract by which I was to get $30 per month; the receipts were all signed by me at one time. I never ran my wife from home. The receipts from Jim Riddle were not for improvements; he was employed by me in crop, and I paid him and he was twice paid if she also paid him."

Witness Draper testified that he took the acknowledgment to the deed from Mrs. Wood to Mr. Wood, in 1905. After the acknowledgment the deed was delivered to Mr. Wood. It was to an undivided one-half interest in a tract of 160 or 220 acres, near Alleene. He prepared the deed at the instance of Mr. Wood, and Mrs. Wood signed and acknowledged it, and witness then handed it to Mr. Wood. Says the witness: "I delivered the deed to Mr. Wood, because it was taken for him, and delivered it in her presence. Wood paid for the acknowledgment, and no money passed between the parties."

A witness by the name of Oglesby testified that he was cashier of the Hempstead County Bank; had examined the books and did not find any account for the year 1899 in the name of Martha C. Gillihan. From the examination made the bank did not issue any statement in 1899 to Martha C. Gillihan showing that she had a balance on deposit of $603.00 or any other amount. On cross-examination, he stated that if Schultz, on May 8, 1899, had transferred to Martha C. Gillihan $603.00 it would not necessarily appear on Mr. Schultz's account as of that date. So far as witness could find, the bank did not then keep an account of the payee of checks. Witness

found no record of the bank that he had examined show-
ing that the bank had ever cashed a check of J. V. Schultz
in the sum of $603.00 during the months of May, June,
July or August, 1899.    Witness found no such check
recorded on the book that he examined, and the record
did not show any balance of $603.00 in favor of Schultz.

Witness Lake testified on behalf of appellant as fol-
lows: "I saw the paper plaintiff testified was from
Hempstead County Bank.    The paper was on the station-
ery of the Hempstead County Bank and showed the sum
of $603.00 due Martha C. Gillihan.    The name of Schultz
was on the paper, but I would not undertake to say
whether it was his obligation or that of the bank.    I only
gave special attention to the date, June 28, 1899, and the
amount, for I expected the paper would be present when
it was wanted."

The court rendered a decree denying appellee's
prayer for a divorce, but quieting title in him to an
undivided one-half interest in all the lands named in his
cross-complaint, and decreeing him a one-half interest in
$199.63, the amount received by the appellant from the
sale of timber, and granting to the appellant alimony in
the sum of $30.00 per month, and decreeing to the appellee
the possession of his house or residence in the city of
De Queen, occupied by the appellant.    The appellant duly
prosecutes this appeal.    Other facts stated in the
opinion.

*Steel, Lake & Head,* for appellant.

1.    As to the 120 acres donated from the State, under
the undisputed proof, the appellee, not having paid any-
thing for the land, can not engraft a trust on the con-
veyance from the State to appellant.    The State was the
donor.    52 Ark. 55; 97 Ark. 568.

2.    It is true that the wife may make a gift of land
or other property to the husband, but all such transac-
tions are scrutinized with great care to see that it was
fairly entered into and that it was the wife's intention
to make the gift.    101 Ark. 451-6; 95 Ark. 526; 88 Ark. 60.

3. Where a husband pays the purchase money and takes deed to the wife, the presumption of law is that a gift to the wife is intended, and the burden is on him to overcome such presumption by proof that is clear and convincing. 101 Ark. 456; 103 Ark. 273-8; 104 Ark. 32-6; 48 Ark. 18; 104 Ark. 301-11; 84 Ark. 322; 76 Ark. 389; 100 Ark. 372.

4. Counsel review the evidence and contend that there was never any delivery of the deed. Both parties say that it was executed so that if anything "happened" her brothers would not inherit. Delivery is a matter of intention, and there is nothing in the circumstances attending the execution of this deed to show that there was any present intention to deliver it. 98 Ark. 466; 97 Ark. 283; 77 Ark. 89; 100 Ark. 427; 55 Ark. 633; 13 Cyc. 748; 50 N. E. 198; 36 N. E. 955; 35 N. E. 94.

*Otis T. Wingo* and *B. E. Isbell,* for appellee.

1. The question of trust, we think, is eliminated by the finding of the court that for a valuable consideration, and without undue influence, the wife made and delivered a deed to one-half interest in the land, and the case resolves itself into the question whether or not such deed was really made and delivered, and if so, was it fairly obtained?

While equity will scrutinize such a transaction jealously, if it is fairly entered into it is binding. 95 Ark. 523. Such scrutiny is to ascertain, and not to defeat, the intention of the parties. 101 Ark. 456; 81 Ark. 328; 75 Ark. 127.

2. That where the husband pays the purchase price and takes the deed in the wife's name, the presumption is that a gift to her is intended, we concede to be true; but it is *only a presumption,* and it may be overcome by evidence showing that the husband's intention was that she should take as trustee and not for her own benefit. 40 Ark. 62; 45 Ark. 484; 71 Ark. 373; 73 Ark. 281; 76 Ark. 389; 89 Ark. 580; 100 Ark. 372; 103 Ark. 273.

3. The deed was delivered. This appears from all the circumstances attending the transaction, not only as

stated by appellee, but also as stated by the disinterested notary. 77 Ark. 89; 74 Ark. 104. While manual delivery was actually had, yet it was not necessary, since appellant's words and acts at the time, and the circumstances under which it was acknowledged, show clearly she intended the deed to take effect, and at once. 97 Ark. 283. The question as to whether or not there was a delivery is one of fact, and the chancellor's finding thereon should be sustained. 100 Ark. 427; 110 Ark. 430.

WOOD, J., (after stating the facts). (1) The title to the land in controversy being in appellant, the burden was upon the appellee to prove the allegations of his cross-complaint by a preponderance of the evidence in order to entitle him to the relief sought. This he wholly failed to do. On the contrary, the clear preponderance of the evidence shows that the appellant purchased the fifteen acres which she had at the time of their marriage from the State and that she donated the 120 acres, and that she furnished the money to purchase the eighty acres designated in the evidence as the Dollarhide tract. She makes a satisfactory explanation as to how she obtained money to acquire this land, and her testimony is corroborated by C. W. Wright and I. B. Wright. She stated that she borrowed part of the money to pay the donation fees from I. B. Wright. I. B. Wright corroborates her in this by stating that he remembered loaning her $10 to donate some land. The appellee himself states that she borrowed the money of I. B. Wright, but that he gave her the money to pay Wright. The appellant denies this, but I. B. Wright corroborates her, for he states that he thought she paid the money back in person.

Appellant shows that she obtained the money to purchase the Dollarhide tract from the sale of her interest in her father's estate, and she is corroborated in this by C. W. Wright, who states that he bought her interest in the Gillihan land at $100, and he shows that $47 of this was paid on the Dollarhide land, and that the balance was used by the appellee on his personal account. The appellee himself states that he used $50 of the money ob-

tained from the sale of the appellant's inheritance on the purchase of the Dollarhide land, but states that he gave his individual note for $75 of the purchase money, which he paid himself; but he does not deny that he used the other $50 on his own account.

(2)    So it is established by a clear preponderance of the evidence that the appellant furnished the money to purchase and to donate the land in controversy. The testimony therefore fails to show any resulting trust in favor of the appellee. But, even if appellant had furnished the money, the presumption, by taking the title in his wife's name, would be that he intended it as a gift, and in that case the proof to overcome this presumption of gift should be clear and convincing. *Carpenter* v. *Gibson,* 104 Ark. 32-36; *Hall* v. *Cox,* 104 Ark. 305-311; *Harbour* v. *Harbour,* 103 Ark. 273-8; *Spradling* v. *Spradling,* 101 Ark. 451-6; *Wood* v. *Wood,* 100 Ark. 372; *Jentzsch* v. *Jentzsch,* 84 Ark. 322; *O'Hair* v. *O'Hair,* 76 Ark. 389; *Bogy* v. *Roberts,* 48 Ark. 17; *Johnson* v. *Richardson,* 44 Ark. 365.

(3-4)    The finding that the appellant executed and delivered to the appellee her deed to an undivided one-half interest in the lands in controversy is not established by a preponderance of the evidence. Because of the marital relation and the dominating influence which a husband has over his wife, it is a rule in equity to scrutinize with care a transaction where a wife conveys her real estate to her husband. While this is true, such conveyance will not be defeated when it clearly appears that the transaction was free from any undue influence on his part, and where it is clearly shown that the wife intended to make a gift of the property to her husband. Such gifts, when free from coercion or any undue influence, should be sustained; but, in such cases, the burden is on the husband to show that the transaction was fair; when the transaction is free from fraud and undue influence, if the real intention of the wife is to convey to her husband her real property as a gift, such intention must be carried out.    *Spradling* v. *Spradling, supra; McDonald* v. *Smith,* 95 Ark. 526; *Mathy* v. *Mathy,* 88 Ark.

60; *Naler* v. *Ballew,* 81 Ark. 328; *Hannaford* v. *Dowdle,* 75 Ark. 127.

These well settled principles, when applied to the facts as to the alleged gift of an undivided one-half of the lands in controversy, do not sustain appellee's contention that there was such a gift. The appellant admits that she executed the deed, but she denies that she delivered the same to the appellee, and as to whether or not there was such a delivery with the intention of making an immediate gift of the undivided half interest in the lands is the only serious question in the case. This is purely an issue of fact, and a correct solution of it depends much upon the credit to be given the testimony of the parties themselves. It could serve no useful purpose to discuss in detail the evidence which has brought us to the conclusion that the greater weight should be given to the testimony of appellant and that the clear preponderance of the evidence shows that she did not deliver the deed to the appellee for the purpose of making an immediate gift to him of the lands in controversy. The appellant states that she made the deed with the understanding that she was to hold the same as long as she lived, and in case she died without leaving him a child he was to have a half interest in it and was to live with her and support her as long as she lived. She did not deliver the deed to him. The appellee himself corroborates the appellant in her statement as to her intention in making the deed, and that it was not to take effect until her death, when he says: "I asked her, saying it was time, so that if anything happened to either one of us, our brothers could not step in and take it away from the other, and she thought it was." In this testimony the appellee shows clearly that the deed was executed for the purpose of preventing the collateral heirs of the appellant from inheriting the property in the event of her death, for that was the only thing that could have happened to the appellant that would have enabled her brothers to deprive the appellee of possession of the property. Evidently appellee used the words "happen

to either of us'' as referring to the death of either one of them.

Appellant's testimony as to her purpose in making the deed is further corroborated by the statement of witness Mrs. Schott, who testified on behalf of appellee, as follows: ''She was speaking of her trouble and said she had burned the deed. I asked her, in the first place, why she wanted to burn the deed, and she said she had made it out so that if anything happened to her that her brother would not get it, but that Emery would get it all.'' She told witness that she had at that time intended that at her death Mr. Wood should have her property; that her brother should not come in; that it was not her intention to relinquish her interest in the land so that Mr. Wood or any one else would get it until her death.

True, Wood testified that it was always understood between them that he was to have a half interest in their home; that he was to have the half interest for doing the work and making the improvements and paying the $75 on the Dollarhide tract. In another place he states that he insisted on his wife making the deed because she would take cranky spells and he was afraid she would get mad and go sell the place or the timber off of it as she had once before. But this does not appeal to us as reasonable and consistent in view of the fact that appellee did not have the deed recorded.

(5-6) Now, appellee stresses the fact that the notary who took the acknowledgment testified that the deed was delivered to appellee, but the notary's testimony further shows that he had drawn the deed at the request and under the directions of appellee, when the appellant was not present; that he carried the deed to her to sign, and might have explained the nature of it to her; that she signed it and acknowledged it, and that he then delivered the deed to the appellee because it was taken for him, and he delivered it in the presence of the appellant. The testimony of this witness, when considered together, has no significance whatever in de-

termining the issue as to whether the deed was delivered by the appellant to the appellee for the purpose of conveying immediate title. His testimony showed that the deed was not delivered to the appellee at the instance and direction of the appellant at all, but that he was acting for the appellee in handing him the deed, and that the mere act of handing or delivering the deed to the appellee was not at appellant's request or suggestion or as her agent, and could not be considered as her act constituting a legal delivery for the purpose of transferring the immediate title to the property; and when appellant, in her testimony, denies that she delivered the deed to the appellee, she manifestly used the word "delivered" in the sense that she did not intend to give him the possession of the deed for the purpose of conveying to him the present title to the property and of giving present dominion and control over the same. The testimony of the appellant all the way through is consistent and reasonable. The testimony of the appellee was contradictory in itself and contradicted by other witnesses, and is inconsistent. The testimony of the appellant was entitled to more credit. Her testimony, in many particulars, was substantially corroborated. Therefore, her testimony as to the purpose for which the deed was executed and on the issue as to the delivery thereof should be taken as the true state of the case. The chancery court erred in not so accepting it.

The decree is therefore reversed and the cause remanded with directions to dismiss appellee's cross-complaint for want of equity.